U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 JUN 26 PM 4: 12

CLERK
BY ___RC___
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 5:12-cr-152 |
| | ) | |
| PAMELA ZYGMONT | ) | |

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS
(Doc. 16)

This matter came before the court on May 28, 2013, for oral argument on Defendant Pamela Zygmont's motion to suppress.[1] (Doc. 16.) The court heard testimony from Vermont State Police ("VSP") Detective Francis LaBombard and Ms. Zygmont.

Ms. Zygmont is charged in the District of Vermont with one count of conspiring to distribute cocaine, cocaine base, and heroin, as part of a conspiracy involving 28 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a) and (b)(1)(B), 846. She seeks to suppress statements she made on August 1, 2012, during an interview conducted by Assistant United States Attorney ("AUSA") Paul Van de Graaf and VSP Detective Francis LaBombard prior to Ms. Zygmont's scheduled grand jury appearance. Ms. Zygmont contends that she was subject to custodial interrogation without the benefit of *Miranda* warnings, that her statements were coerced and therefore involuntary, and that her statements were taken in violation of her right to remain silent and her right to counsel.

The government opposes the motion to suppress, arguing Ms. Zygmont was not in custody for *Miranda* purposes and that her statements were not obtained in violation of her constitutional rights.

---

[1] The court also heard oral argument on Defendant's motion to compel (Doc. 15), which the court denied in a ruling on the record.

Ms. Zygmont is represented by John C. Mabie, Esq. The government is represented by AUSA Paul J. Van de Graaf and AUSA Joseph R. Perella.

I. **Findings of Fact.**

Based upon the admissible evidence, the court makes the following findings of fact. In the course of investigating the July 28, 2011 death of Melissa Barratt and Frank Caraballo's potential role in that death, the government sought to interview Ms. Zygmont, who is the mother of Mr. Caraballo's child, regarding Mr. Caraballo's whereabouts on the date in question. Frank Caraballo is charged with various drug and firearms offenses in the District of Vermont in connection with Ms. Barratt's death.

In July 2012, the government subpoenaed Ms. Zygmont's appearance at a grand jury proceeding in which Mr. Caraballo was the apparent target. After receiving the subpoena, Ms. Zygmont was incarcerated in Massachusetts on unrelated state court charges stemming from her arrest in Northampton, Massachusetts for assault and battery, and her subsequent arrest in Holyoke, Massachusetts on charges including possession of crack cocaine. Two separate attorneys represent Ms. Zygmont in the Massachusetts criminal cases.

On the day of her scheduled grand jury appearance, the United States Marshal's Service transported Ms. Zygmont from Keene, New Hampshire, where she was held temporarily, to Rutland, Vermont. When Ms. Zygmont arrived at the federal courthouse in Rutland, AUSA Van de Graaf and Detective LaBombard arranged to speak with her. The Marshals chose the location for the interview and were responsible for the manner in which Ms. Zygmont was restrained. Ms. Zygmont was shackled but not handcuffed during the interview, although she arrived at the interview with both sets of restraints. The interview took place in a room in the Marshal's office at a table with a partition that separated Ms. Zygmont from the two interviewers. The interview room was a secure room, and Ms. Zygmont was not free to leave the room without an escort. At no point during the interview did AUSA Van de Graaf or Detective LaBombard provide *Miranda* warnings.

2

At the outset of the interview, AUSA Van de Graaf and VSP Detective LaBombard introduced themselves, telling Ms. Zygmont who they were and for whom they worked. Ms. Zygmont testified that, notwithstanding these introductions, she thought one of the interviewers was Mr. Caraballo's attorney since she presumed that the grand jury proceeding was focused on Mr. Caraballo and that she would have to testify against him. When pressed, however, Ms. Zygmont conceded that she was told AUSA Van de Graaf was a federal prosecutor, and she admitted she knew AUSA Van de Graaf and Detective LaBombard were not there to "help" her. There is thus no evidence to support a conclusion that Ms. Zygmont was misled by the interviewers that either of them was Mr. Caraballo's attorney.

AUSA Van de Graaf explained to Ms. Zygmont that she was not obligated to answer their questions and that she could have an attorney present during the interview. Ms. Zygmont agreed to speak without an attorney present; at no point during the interview did she request an attorney, ask the interviewers to contact one or both of her Massachusetts attorneys, or refuse to continue to answer their questions without an attorney present. Neither AUSA Van de Graaf nor Detective LaBombard explained what Ms. Zygmont needed to do in order to leave the room or terminate the interview, and she did not ask. AUSA Van de Graaf explained to Ms. Zygmont what would happen at the grand jury proceeding if she testified, and he offered to review with her the questions he planned to ask her. The primary focus of the interview was Mr. Caraballo and his alleged role in Ms. Barratt's death.

The interview proceeded in a conversational manner. Ms. Zygmont was calm and cooperative throughout the interview. Prior to the interview, she had experience with the criminal justice system and had completed high school and one year of college. In her testimony before the court, she revealed no cognitive deficits, confusion, or inability to understand the nature of the questions posed to her.

The interviewers did not raise their voices, make any display or threat of force, and did not physically touch Ms. Zygmont. Although neither interviewer directly accused Ms. Zygmont of lying, they expressed doubt as to the veracity of some of her

statements. Specifically, AUSA Van de Graaf told Ms. Zygmont that he did not believe she was being honest in her answers to his questions regarding the events surrounding the day of Ms. Barratt's death.

The interview lasted no longer than thirty minutes. Although Detective LaBombard was aware that Ms. Zygmont had pending Massachusetts charges, he did not know the nature of those charges or the court in which they were pending. Neither he nor AUSA Van de Graaf attempted to contact Ms. Zygmont's Massachusetts attorneys. At her grand jury appearance, Ms. Zygmont refused to proceed without an attorney. She did not appear before the grand jury until counsel was appointed.

## II. Conclusions of Law and Analysis.

### A. Whether Ms. Zygmont Was in Custody for *Miranda* Purposes.

Under *Miranda*, a police officer may not question a suspect who has been taken "into custody" without first warning the suspect that he or she:

> has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If no warning is given to a suspect who is in custody, the prosecution may not use statements obtained during the interrogation in its case-in-chief. *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

"A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation." *United States v. Ramos*, 2012 WL 1854747, at *11 (D. Vt. May 21, 2012); *see also United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986) ("[Defendant] had the burden of proving that he was under arrest or in custody[.]").

"[W]hether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011); *see also Yarborough v. Alvarado*, 541 U.S. 652,

663 (2004) (same). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave[.]" *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The Second Circuit has held that "[t]he free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody." *Newton*, 369 F.3d at 670. "The 'ultimate inquiry' for determining *Miranda* custody . . . [is] 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). A court must "examine all of the circumstances surrounding the interrogation." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

> Those circumstances include, inter alia, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion[.] . . . The circumstances also include . . . the nature of the questions asked.

*United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (internal citations omitted).

Ms. Zygmont seeks to suppress her statements made during the August 1, 2012 interview, because she contends that she was subjected to custodial interrogation without the benefit of *Miranda* warnings. The government contends that *Miranda* warnings were not required because "there were no coercive circumstances that made the interview setting custodial within the meaning of the Fifth Amendment." (Doc. 17 at 3.) The court agrees.

To the extent that Ms. Zygmont relies on her status as an inmate incarcerated in Massachusetts on unrelated state court charges, her reliance is misplaced. There is no per se rule that an incarcerated individual is in custody for *Miranda* purposes whenever law enforcement interviews that individual.[2] *See Howes v. Fields*, 132 S. Ct. 1181, 1187-89

---

[2] There is also no per se rule that a person is in custody for *Miranda* purposes during a grand jury proceeding. *See Minnesota v. Murphy*, 465 U.S. 420, 431 (1984) ("[W]e have never held that

5

(2012) ("[O]ur decisions do not clearly establish that a prisoner is always in custody for purposes of *Miranda* whenever a prisoner is isolated from the general prison population and questioned about conduct outside the prison."); *Maryland v. Shatzer*, 130 S. Ct. 1213, 1224 (2010) (analyzing the difference between being in custody for incarcerative rather than interrogative purposes and concluding that "lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda*"); *see also Georgison v. Donelli*, 588 F.3d 145, 157 (2d Cir. 2009) (rejecting "interpretation . . . that all prisoners are 'in custody' for purposes of *Miranda*"); *Newton*, 369 F.3d at 670 ("[Defendant] was a prison inmate at the time of the challenged questioning; thus, incarceration, not liberty, was his status quo. We have declined, however, to equate such incarceration with custody for purposes of *Miranda*."). Instead, the custody inquiry must "focus on all of the features of the interrogation," *Howes*, 132 S. Ct. at 1192, because "[t]o look only at any single factor would be inconsistent with *Miranda*'s role as a protection against coercion." *FNU LNU*, 653 F.3d at 154.

Ms. Zygmont's status as an incarcerated inmate, however, remains relevant in determining "how a reasonable person in the suspect's position would perceive his or her freedom to leave." *J.D.B.*, 131 S. Ct. at 2402 (internal quotation marks and citations omitted). For a "reasonable person" in Ms. Zygmont's position, "incarceration, not liberty, was [her] status quo." *Newton*, 369 F.3d at 670; *see also United States v. Artis*, 2010 WL 3767723, at *5 (D. Vt. Sept. 16, 2010) ("Of course, as part of the totality of circumstances, the fact of incarceration remains relevant to the court's analysis of whether custodial interrogation has taken place."). An incarcerated person interviewed by the government therefore is in custody for *Miranda* purposes only if the person suffered a "measure of compulsion above and beyond that inherent in custody itself," or

---

[*Miranda* warnings] must be given to grand jury witnesses[.]"); *United States v. Weiss*, 752 F.2d 777, 786 (2d Cir. 1985) ("It is now well settled that a witness before a grand jury may not dismiss an indictment for perjury because he was the target of an investigation, or because he was not advised of his *Miranda* rights[.]"). "Courts have reached the same conclusion with respect to pre-grand jury interviews, finding that such interviews do not generally constitute custody for purposes of *Miranda*." *United States v. Soteriou*, 2012 WL 5426440, at *5 (D. Vt. Nov. 7, 2012) (collecting cases).

"restrictions on . . . freedom over and above ordinary prison confinement," such that a reasonable incarcerated person would not have felt free to leave or terminate the interview. *Georgison*, 588 F.3d at 157-58 (internal quotation marks omitted); *see also United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) ("Only questioning that reflects a measure of compulsion above and beyond that inherent in custody itself constitutes interrogation the fruits of which may be received in evidence only after *Miranda* warnings have been given.").

Ms. Zygmont's freedom of movement was, at times, restrained commensurate with a formal arrest because the Marshals transported her to the Rutland courthouse in shackles and handcuffs, and escorted her to and from the interview in those restraints. However, those restraints were attributable to Ms. Zygmont's status as an inmate in the temporary custody of the Marshal's Service, they were unrelated to and not occasioned by AUSA Van de Graaf's and Detective LaBombard's interview. Indeed, Ms. Zygmont was subjected to significantly lesser restraints during the interview. She was not handcuffed and she was separated from the interviewers by a partition. The interviewers neither touched her, attempted to touch her, or threatened to touch her in anyway. In this respect, her status during the interview was inconsistent with a formal arrest. Because the restraints that remained intact during the interview reflected "restrictions" of "ordinary prison confinement," *Georgison*, 588 F.3d at 157-58, for an incarcerated inmate in the Marshal's custody, the fact that Ms. Zygmont was shackled during the interview does not render it custodial.

Similarly, the requirement of an escort did not transform Ms. Zygmont's interview into custodial interrogation. In *United States v. Kirsteins*, 906 F.2d 919, 924 (2d Cir. 1990), the Second Circuit acknowledged that the defendant was escorted to the street and back during a break in questioning. The court, however, concluded that neither the escort, nor any other circumstance, gave "rise to the level of custodial supervision" because "[t]he attorney [who escorted defendant] never touched [defendant] or physically impeded his movements in any way." *Id.*; *see also United States v. Ross*, 719 F.2d 615, 622 (2d Cir. 1983) ("The mere fact that [suspect] was told he would be accompanied by

7

an IRS agent when he moved about the [place of interrogation] did not place him in custody within the meaning of *Miranda* [.]"); *United States v. Soteriou*, 2012 WL 5426440, at *6 (D. Vt. Nov. 7, 2012) ("Defendant's reliance upon the fact that he was escorted through the United States Attorney's Office, while relevant, does not render the interview custodial in nature."). Here, the two individuals conducting the interview had no role in Ms. Zygmont's escort, and they did not physically impede her freedom of movement to and from the interview room or while she was in the interview room. As such, neither interviewer subjected Ms. Zygmont to restrictions on her freedom "over and above [the] ordinary prison confinement." *Georgison*, 588 F.3d at 157-58.

Ms. Zygmont clearly was not free to leave the Marshal's custody at the time of the interview, however, this fact is distinct from whether she was free to leave the interview itself. Although the interviewers did not advise Ms. Zygmont that she was free to leave, they told her that she did not need to answer their questions and, more importantly, they did not state or suggest to her that she was not free to leave. *See United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) (noting "presence or absence of affirmative indications that the defendant was not free to leave" is often a factor, the court concluded defendant was not in custody when, in part, no one "affirmatively convey[ed] the message that the defendant [was] not free to leave"); *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (noting one factor in a "custody" determination is "whether a suspect is or is not told that she is free to leave").

Other facts and circumstances further support the conclusion that the interview was noncustodial. The interviewers advised Ms. Zygmont that that she could have an attorney present throughout the interview and Ms. Zygmont's subsequent invocation of her right to counsel demonstrates that she understood how to exercise this right. The interview was relatively brief in duration, took place in a conversational manner, and was free of threats, physical touching, or a show of force. Ms. Zygmont's own demeanor, which was calm and cooperative, supports a conclusion that the interrogation was noncustodial in nature. *See United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) (concluding defendant not in custody when, among other factors, the "interview

8

was conducted in an open, friendly tone," defendant "participated actively," and the "conversation was plainly consensual"); *see also United States v. Norrie*, 2013 WL 1285864, at *17 (D. Vt. Mar. 26, 2013) ("The interview proceeded in a conversational manner with Defendant freely asking as well as answering questions."); *United States v. Weisinger*, 2012 WL 6164306, at *6 (D. Vt. Dec. 11, 2012); *United States v. Smith*, 2012 WL 5187922, at *6 (D. Vt. Oct. 18, 2012). The interview was thus "'consistent with an . . . environment in which a reasonable person would have felt free to terminate the interview and leave.'" *Howes*, 132 S. Ct. at 1193-94 (quoting *Yarborough*, 541 U.S. at 664-65).

Ms. Zygmont nonetheless asserts that she "was otherwise coerced, tricked or misled into making incriminating statements." (Doc. 16-1 at 5). She presented no evidence of this, and confirmed that she understood who the interviewers were, why they were questioning her, and the potential for self-incrimination as she conceded the interviewers were not there to "help her." *See Mitchell*, 966 F.2d at 100 ("To prevail on a claim of trickery and deception [defendant] must produce clear and convincing evidence that the [officers] affirmatively misled [him] as to the true nature of [their] investigation.") (citation and internal quotation marks omitted). The court thus finds no evidence of coercion, trickery or deception.

In the course of the brief interview, AUSA Van de Graaf and Detective LaBombard expressed doubt as to the veracity of some of Ms. Zygmont's statements. They did not, however, accuse her of lying to them, seek to overbear her will, or coerce her to recant or change her statements. Instead, they terminated the interview almost immediately upon their conclusion that she was no longer being truthful. *Cf. Tankleff*, 135 F.3d at 244 (concluding defendant in custody when defendant, for two hours, "had been subjected to increasingly hostile questioning at the police station, during which the detectives had accused him of showing insufficient grief, had said that his story was 'ridiculous' and 'absurd,' and had added that they simply 'could not accept' his explanations").

Finally, the interviewers did not convey to Ms. Zygmont that they had the power to affect her conditions of confinement. To the contrary, Ms. Zygmont appears to have fully understood that she was only temporarily in federal custody on an unrelated matter and would soon return to Massachusetts state custody once her participation in the grand jury proceeding concluded. This, too, weighs in favor of finding the interrogation was noncustodial. *See Norrie*, 2013 WL 1285864, at *21 ("Defendant was in custody when he appeared before the grand jury as he was incarcerated at the time. However, his testimony before the grand jury was unrelated to the reasons for his incarceration and there was no indication that his testimony would have any influence on the circumstances of his imprisonment. Thus, his incarceration alone did not necessitate *Miranda* warnings prior to his grand jury testimony where such warnings would not otherwise be required."); *Artis*, 2010 WL 3767723, at *5-6 (noting that defendant was incarcerated for an unrelated crime and that he was not threatened with any greater restrictions on his freedom or further punishment for failure to answer questions, the court concluded that his "status as an inmate therefore did not, alone, transform the . . . interview into custodial interrogation").

Based on the totality of the circumstances, a reasonable person in Ms. Zygmont's position would have felt "she was at liberty to terminate the interrogation and leave." *J.D.B.*, 131 S. Ct. at 2402 (internal quotation marks omitted). Accordingly, she has not sustained her burden of proving she was in custody for purposes of *Miranda*, and the court DENIES Ms. Zygmont's motion to suppress on this basis.

**B.    Whether Ms. Zygmont's August 1, 2012 Statements Were Involuntary.**

"The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry." *Dickerson v. United States*, 530 U.S. 428, 444 (2000). Under the Fifth Amendment, a defendant's involuntary confession is not admissible at trial. *Id.* at 433. "[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered." *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010) (quoting *Lego v. Twomey*, 404 U.S. 477, 489

(1972)). "Accordingly, courts place upon the government the burden to prove that a defendant's confession was voluntary." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)). The Supreme Court has held that "the voluntariness of a statement" depends on whether "the defendant's will was overborne" by police coercion. *Yarborough*, 541 U.S. at 667-68 (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)). Accordingly, coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Fifth Amendment. *Connelly*, 479 U.S. at 164.

"[W]hether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). "In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Id.* at 901-02. "The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence." *Id.* at 902. "The second circumstance, the conditions under which a suspect is questioned, includes the place where an interrogation is held, and the length of detention." *Id.* (internal citations omitted).

> The final . . . circumstance . . . is the law enforcement officers' conduct. Facts bearing on that conduct include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights, whether there was physical mistreatment such as beatings, or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep, or even of clothing for a prolonged period. In addition . . . such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits.

*Id.* (internal citations omitted). The conduct of law enforcement is particularly important because "a defendant's mental condition, by itself and apart from its relation to official

11

coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'"
*Connelly*, 479 U.S. at 164.

Ms. Zygmont contends that her statements were not voluntary because they were improperly coerced by the government. She argues that she did not know to whom she was speaking or that she was likely a target of a criminal prosecution. In her testimony before the court, however, Ms. Zygmont acknowledged that the interviewers identified themselves and told her the purpose of their questioning. She fully understood they were not there to help her, but rather sought information regarding the whereabouts of Frank Caraballo on the date of Melissa Barratt's death and sought to have Ms. Zygmont testify against him. There is no evidence that any of Ms. Zygmont's statements were the product of trickery or deceit.

There is also no evidence of law enforcement coercion. Neither interviewer engaged in "repeated and prolonged . . . questioning" of Ms. Zygmont designed or intended to overcome her free will. *Green*, 850 F.2d at 902. The interviewers did not raise their voices, use profanity, or otherwise pressure Ms. Zygmont to answer their questions. The "nature of the interrogation" was conversational, not combative. *See Guarno*, 819 F.2d at 31 (affirming finding of voluntariness when defendant was neither "questioned in a hostile environment nor . . . subjected to rigorous interrogation"). Although Ms. Zygmont was shackled during the interview, she was neither handcuffed nor subjected to "physical mistreatment such as beatings, or long restraint in handcuffs, [or] other physical deprivations." *Green*, 850 F.2d at 902. The interview lasted no longer than thirty minutes. *See Williams*, 681 F.3d at 45 (concluding statement voluntary in part due to its "brevity"); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (concluding statement voluntary when "interrogations were relatively short").

Moreover, the "alleged failure to notify [Ms. Zygmont] that [she] may be a target of the investigation does not give rise to a constitutional violation." *Norrie*, 2013 WL 1285864, at *22; *see also United States v. Washington*, 431 U.S. 181, 189 (1977) ("Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential-defendant warnings add

12

nothing of value to protection of Fifth Amendment rights."); *United States v. Valentine*, 820 F.2d 565, 572 (2d Cir. 1987) (affirming denial of motion to suppress on the basis that failure to provide a target warning is not unconstitutional since there is "no constitutional right to receive a target warning").

Similarly, the absence of *Miranda* warnings, while relevant, is not dispositive. *See J.D.B.*, 131 S. Ct. at 2411 (noting *Miranda* requirements "often require courts to suppress 'trustworthy and highly probative' statements that may be perfectly 'voluntary under [a] traditional Fifth Amendment analysis'") (internal citations omitted). Here, the interviewers advised Ms. Zygmont that she could have counsel present and that she was not obligated to answer their questions. In the face of such advice, a defendant's claim that he or she nonetheless felt compelled to make statements is unavailing. That conclusion is underscored by the absence of evidence that Ms. Zygmont was unusually vulnerable in the face of law enforcement interrogation. *See Green*, 850 F.2d at 902. Ms. Zygmont is an adult who completed high school and one year of college. Prior to the August 1, 2012 interview, she had experience with the criminal justice system, and she had access to two attorneys. *See United States v. Spencer*, 995 F.2d 10, 12 (2d Cir. 1993) (ruling that defendant's waiver of counsel was knowing and voluntary, court observed that "this arrest was not his first encounter with the criminal justice system."). She demonstrated an understanding of how to invoke her rights and when to do so. *See United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) (noting defendant's "frequent encounters with law enforcement personnel" and that defendant understood how to invoke his rights as factors supporting finding of voluntariness). She remained calm and cooperative throughout the interview and did not recant her statements regarding the events on the date of Ms. Barratt's death, despite the interviewers' expressions of doubt. Her will was thus clearly not overborne.

In summary, there is no evidence that Ms. Zygmont's statements were the product of police coercion. On this basis alone, denial of the motion to suppress is required. *See Connelly*, 479 U.S. at 164. There is also no other aspect of the interview that would

13

support a finding of involuntariness. For the foregoing reasons, the court hereby DENIES Ms. Zygmont's motion to suppress her statements on voluntariness grounds.

### C. Whether Ms. Zygmont's Right to Counsel Was Violated.

Finally, Ms. Zygmont contends that her right to counsel was violated because her Massachusetts attorneys were not contacted before and permitted to be present during the interview.[3] The government counters that Ms. Zygmont's Sixth Amendment right to counsel had not attached with regard to her indictment in Vermont for the pending charge and that the government did not question her about the pending offenses in Massachusetts.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." The right "to assistance of counsel in 'all criminal prosecutions' is limited by its terms: 'it does not attach until a prosecution is commenced.'" *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 198 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). Commencement is "'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Id.* (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)); *see also Brewer v. Williams*, 430 U.S. 387, 398 (1977) (same). "'[A]fter the . . . right to counsel attaches and is invoked, any statements obtained from the accused during subsequent police-initiated custodial questioning regarding *the charge at issue* . . . are inadmissible.'" *United States v. Jacques*, 684 F.3d 324, 330 (2d Cir. 2012) (quoting *McNeil*, 501 U.S. at 179) (emphasis supplied).

---

[3] Ms. Zygmont also claims that the interviewers violated her right to remain silent; she did not, however, brief this issue or testify that she attempted to invoke this right. Accordingly, the court does not address the issue further. *See Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 2259-60 (2010) (requiring suspect to unambiguously and unequivocally invoke right to remain silent); *see also United States v. Awan*, 384 F. App'x 9, 16 n.4 (2d Cir. June 14, 2010) (declining to address claim "insufficiently argued") (citing *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived[.]"); *United States v. Elliott Fuentes*, 2012 WL 4754736, at *3 (W.D.N.Y. Apr. 25, 2012) (deeming arguments waived that were "conclusory," "boilerplate," or "undeveloped") (collecting cases).

Because the Sixth Amendment right is "offense specific," "[i]t cannot be invoked once for all future prosecutions." *McNeil*, 501 U.S. at 175; *see also Texas v. Cobb*, 532 U.S. 162, 165 (2001) (reaffirming that "decision in *McNeil* meant what it said, and that the Sixth Amendment right is offense specific"). "Offense specific" means only the offense charged and does not include "other offenses 'closely related factually' to the charged offense." *Cobb*, 532 U.S. at 165; *see also id.* at 168 (declining to adopt view of some lower courts that have "read into *McNeil*'s offense-specific definition an exception for crimes that are 'factually related' to the charged offense"). As a result, "the government does not violate the Sixth Amendment rights of a defendant charged with a crime by . . . interrogating that defendant with regard to a separate crime that has not been charged." *Jacques*, 684 F.3d at 331 (citing *Maine v. Moulton*, 474 U.S. 159, 180 (1985)).

Ms. Zygmont argues that her subsequent indictment as a participant in a drug conspiracy in the District of Vermont and elsewhere necessarily relates to her conduct in Massachusetts, where Ms. Zygmont had a pending drug charge on August 1, 2012. However, because the Sixth Amendment right is "offense specific," Ms. Zygmont was entitled to have her Massachusetts attorneys present only if the government queried Ms. Zygmont about the pending Massachusetts charges. *See Cobb*, 532 U.S. at 165, 168; *McNeil*, 501 U.S. at 175. There is no evidence that the government did so. To the contrary, the August 1, 2012 interview focused on the alleged disappearance and death of Ms. Barratt, for which Ms. Zygmont had and has not been charged. Accordingly, the government did not violate Ms. Zygmont's Sixth Amendment right to counsel on August 1, 2012, when it failed to call her Massachusetts attorneys and permit their presence at the interview. Had Ms. Zygmont desired their presence, the government advised her that it would honor any such request. The court therefore DENIES Ms. Zygmont's motion to suppress alleging a violation of her right to counsel.

## CONCLUSION

For the reasons stated above, the court DENIES Defendant's motion to suppress. (Doc. 16).

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 26th day of June, 2013.

Christina Reiss, Chief Judge
United States District Court